IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


STATE OF OHIO, *ex rel.* MARC DANN,

             Plaintiff,

    vs.                              Civil Action 2:08-CV-79
                                       Judge Watson
                                       Magistrate Judge King

SHERWIN-WILLIAMS COMPANY,
*et al.*,

             Defendants.


<u>REPORT AND RECOMMENDATION</u>

      Plaintiff alleges that the ten defendants, or their predecessors in interest, manufactured, processed, marketed, promoted, supplied, distributed, and/or sold lead in the State of Ohio or for use in the State of Ohio, thereby creating and/or maintaining a public nuisance throughout the state.  This action was originally filed in the Court of Common Pleas for Franklin County, Ohio.  Defendant Atlantic Richfield Company ("ARCO") removed the action to this Court pursuant to 28 USC § 1442(a)(1).  Doc. No. 2.  This matter is before the Court, on referral by Judge Watson, *Order,* Doc. No. 58, on *Plaintiff State of Ohio's Motion to Remand to State Court* ("*Motion to Remand*"), Doc. No. 38.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the *Motion to Remand* be **GRANTED**.

I.    **BACKGROUND**

      Defendant ARCO, a Delaware corporation with its principal place of business in Illinois, is the successor-in-interest to several companies, including International Smelting and Refining Company ("IS&R").  *Amended Complaint*, Doc. No. 5, ¶ 6.  ARCO's predecessors-

in-interest manufactured, processed, marketed, promoted, supplied,
distributed and/or sold leaded products to a variety of paint
manufacturers in Ohio.  *Id*. at ¶ 39.   Plaintiff alleges that lead is
an inherently dangerous product that negatively impacts children's
health.  *Id*. at ¶¶ 19-20.  According to plaintiff, lead still exists
in "many homes, schools, hospitals and other public and private
buildings throughout the State[,]" which "poses a continuing health
hazard to citizens of the State."  *Id*. at ¶ 21.  Plaintiff alleges
that all of the defendants "knew and/or should have known since the
early 1900's that lead is hazardous to human health[,]" and that safer
alternatives existed, but that defendants "continued to manufacture,
process, market, promote, supply, distribute and/or sell lead or paint
coatings, or pigments that contained lead."  *Id*. at ¶¶ 22-28.
Plaintiff further alleges that, "for decades," defendants
misrepresented products containing lead as safe, promoted such
products and failed to disclose the dangers of using and exposing
children to lead.  *Id*. at ¶¶ 29-33.

Plaintiff alleges that, as a result, plaintiff "has suffered
substantial damages, including, but not limited to, the cost of
discovering and abating lead and/or otherwise attempting to keep
residents from being exposed to lead."  *Id*. at ¶ 33.  Plaintiff
alleges that children and adults continue to be injured by defendants'
lead and that defendants "contributed to the creation and maintenance
of a single public nuisance in Ohio, which is the cumulative effect of
lead in the pigment, paints and coatings found throughout the State of
Ohio."  *Id*. ¶¶ 33-35.

On April 2, 2007, plaintiff filed its original complaint in the

2

Court of Common Pleas of Franklin County, Ohio.  *Notice of Removal*,
Doc. No. 2.  On December 28, 2007, plaintiff filed the *Amended
Complaint*, alleging a claim of public nuisance against defendants and
asking for judgment against defendants, jointly and severally.
*Amended Complaint.*

ARCO removed the action to this Court on January 28, 2008,
pursuant to 28 U.S.C. § 1442(a)(1).  *Notice of Removal.*  ARCO contends
that, between November 1936 and July 1946, its predecessor, IS&R,
produced white lead carbonate pigment which was used by IS&R's
customers in ceramics, paints and other products.  *Id*. at ¶ 8.  ARCO
argues that the fourteen paint manufacturers in Ohio to which ARCO's
predecessors, including IS&R, allegedly sold, distributed and marketed
lead products, *see Amended Complaint,* ¶ 39, are companies that "were
selling paints for military purposes."  *Notice of Removal*, at ¶¶ 10-
11.  ARCO contends that, during the 1930's and 1940's, the federal
government mobilized a wide-ranging war effort that included applying
lead paints (that used lead pigments) for housing projects for
civilian workers and families.  *Id*. at ¶¶ 11-14.  During this time,
the federal government not only issued detailed specifications for
paint and pigments containing white lead carbonate but also controlled
inventories and prices of lead.  *Id*. at ¶¶ 13-15.  ARCO argues that,
to the extent that IS&R allegedly sold lead pigment to Ohio paint
manufacturers who in turn made paint for the United States government,
IS&R was "acting under" federal officers as a federal contractor.  *Id*.
at ¶ 16.  To that extent, ARCO also contends that it has a federal
contractor defense to the claims asserted against it.  *Id.*

On February 27, 2008, plaintiff moved to remand this action,

3

arguing that ARCO fails to satisfy the requirements of 28 U.S.C. §
1442(a)(1). *Motion to Remand*, p. 1. More specifically, plaintiff
contends that ARCO failed to establish that it "acted under" the
direction of a federal officer or that the requisite causal nexus
exists between the alleged conduct of ARCO's predecessors and the
conduct alleged in the *Amended Complaint*. *Id.* ARCO opposes the
*Motion to Remand*. *See Atlantic Richfield Company's Memorandum in
Opposition to Plaintiff's Motion to Remand* ("*Memo. in Opp.*"), Doc. No.
50. The remaining nine defendants join ARCO's position, asserting
that "[f]ederal jurisdiction over this case is proper and therefore
Plaintiff's Motion to Remand should be DENIED." *Defendants' Joinder
in Defendant Atlantic Richfield Company's Memorandum in Opposition to
Plaintiff's Motion to Remand*, Doc. No. 49, p. 2. Plaintiff filed its
reply on June 17, 2008, *Plaintiff State of Ohio's Reply to Defendants'
Memorandum in Opposition to the State of Ohio's Motion to Remand to
State Court* ["*Reply*"], Doc. Nos. 54, 55. ARCO supplemented its *Memo.
in Opp.* on June 20, 2008. *ARCO's Motion for Leave to File
Supplemental Response,* ["*Surreply*"], Doc. No. 56. Oral argument on
the *Motion to Remand* was held on August 25, 2008.

**II.   STANDARD OF REVIEW**

The federal officer removal statute, 28 U.S.C. § 1442(a)(1),
provides, in pertinent part, as follows:

> A civil action or criminal prosecution commenced in a State
> court against any of the following may be removed by them to
> the district court of the United States for the district and
> division embracing the place wherein it is pending:
>
> (1) The United States or any agency thereof or any officer
> (or any person acting under that officer) of the United
> States or of any agency thereof, sued in an official or

individual capacity for any act under color of such office
or on account of any right, title or authority claimed under
any Act of Congress for the apprehension or punishment of
criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).  The statute is to be liberally construed.
*Watson v. Philip Morris Companies, Inc.*, 127 S. Ct. 2301, 2304-05
(2007).

A party seeking to invoke federal jurisdiction on removal bears
the burden of establishing that jurisdiction is properly invoked.
*Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 949 (6th Cir. 1994).
*See also Orthopedic Specialists of N.J. PA v. Horizon Blue Cross/Blue
Shield*, 518 F. Supp.2d 128, 133 (D. N.J. 2007) ("Defendant bears the
burden of demonstrating the existence of jurisdiction in this Court
under section 1442(a)(1).").  Therefore, a defendant seeking removal
under section 1442(a)(1) first

must show that it is a "person" within the meaning of the
statute.  Second, it must establish that it was "acting
under" a federal officer, which subsumes the existence of a
"causal connection" between the charged conduct and asserted
official authority.  Finally, the defendant must raise a
colorable federal defense.[1]

*In re Methyl Tertiary Butyl Esther*, 488 F.3d 112, 124 (2d Cir. 2007)
(quoting *Willingham v. Morgan*, 395 U.S. 402, 405-06 (1969)).  *See also
Jefferson County v. Acker*, 527 U.S. 423, 430-31 (1999); *Mesa v.
California*, 489 U.S. 121,132-34 (1989).

## III. DISCUSSION

### A.  "Person"

Plaintiff does not dispute that the status of either ARCO or IS&R

---

[1]Some courts consider this a four-part test, separating into two
requirements "acting under" and "causal connection."  *See*, *e.g.*, *Ferguson v.
Lorillard Tobacco Co.*, 475 F. Supp. 2d 725, 729 (N.D. Ohio 2007) (discussing
four requirements).

as a corporation satisfies the definition of "person" within the meaning of section 1442(a)(1). Accordingly, the Court will not analyze this requirement, but simply notes that the majority of courts addressing this issue have concluded that a corporation may qualify as a "person" under the removal statute. *See*, *e.g.*, *Isaacson v. Dow Chemical, Co.*, 517 F.3d 129, 135-36 (2d Cir. 2007); *In re Methyl Tertiary Butyl Esther*, 488 F.3d at 124; *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998); *Reg'l Med. Transport, Inc. v. Highmark, Inc.*, 541 F. Supp.2d 718, 723-24 (E.D. Pa. 2008); *Swanstrom v. Teledyne Continental Motors, Inc.*, 531 F. Supp.2d 1325, 1331 (S.D. Ala. 2008); *Orthopedic Specialists of N.J. PA*, 518 F. Supp.2d 128 at 134.

**B.    "Acting Under"**

**1.    Statutory construction and purpose**

ARCO must also show that it was "acting under" a federal officer or agency. 28 U.S.C. § 1442(a)(1). The words "acting under" are broadly interpreted. *See Watson*, 127 S. Ct. at 2304-05. However, this broad construction is not without limit and is restricted by the statute's "language, context, history, and purposes." *Id*. at 2305.

*Watson* explained the rationale underlying the statute: "State-court proceedings may reflect 'local prejudice' against unpopular laws or federal officials[,]" which may impede the enforcement of federal law. *Id.*, 127 S. Ct. at 2307. Such bias may also "deprive federal officials of a federal forum in which to assert federal immunity defenses." *Id*. To guard against local prejudice, the removal statute

6

aims to "protect[] persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson*, 517 F.3d at 133 (citing *Watson*, 127 S. Ct. at 2306-07).

It was against this backdrop of the removal statute's purpose that *Watson* analyzed the statutory language "acting under." *Watson*, 127 S. Ct. 2301. According to the Supreme Court, "under" refers to a "relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office[,]'" which "typically involves 'subjection, guidance, or control.'" *Id*. at 2307 (citations omitted). "[T]he private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id*. at 2307 (emphasis in original). This assistance "does *not* include simply *complying* with the law." *Id*. (emphasis in the original) (recognizing that private persons such as taxpayers who file tax returns and airline passengers who refrain from smoking because of federal regulations comply with, or acquiesce to, federal law and are not "acting under" a federal official). Rather, the assistance must "go[] beyond simple compliance with the law and help[] [federal] officers fulfill other basic governmental tasks[,]" such as "helping the Government produce an item that it needs." *Id*. at 2308.

Mere compliance with governmental regulation does not constitute "acting under" because compliance does not trigger the concerns underlying the removal statute. *Id*. at 2307-08. For example, a private company's compliance with complex federal regulations does not generally create "a significant risk of state-court 'prejudice.'" *Id*.

7

Similarly, a state-court action based on a company's compliance is unlikely to impede the enforcement of federal law or to deprive federal officials of a federal forum when asserting federal immunity defenses. *Id*. at 2308. Accordingly, there must be evidence of a "special relationship" "as distinct from the usual regulator/regulated relationship." *Id*. at 2310.

Therefore, a private company subject to complex federal regulation and scrutiny who shows nothing more than simple compliance falls outside the scope of the statute:

> The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." *And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored. A contrary determination would expand the scope of the statute considerably*, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries. Neither language, nor history, nor purpose lead us to believe that Congress intended any such expansion.

*Id*. at 2308 (citations omitted) (emphasis added).

### 2. Arguments of the parties

Plaintiff contends that the *Notice of Removal* is defective because it fails to allege that IS&R was awarded a contract to supply lead for the war effort and fails to allege that there was any business relationship between IS&R and the federal government (specifically, the War Department). *Motion to Remand*, pp. 9-11. Plaintiff argues that "ARCO's lack of a contract with the federal government to supply lead for paint means that it had no business relationship with the federal government" because "[h]aving a lead-

8

paint contractor as a customer does not make IS&R a contractor itself." *Id.* at 10.  Plaintiff suggests that IS&R's only obligation was to deliver lead to paint companies in exchange for the purchase price and ARCO cannot "piggyback on its customers' purported contracts with the federal government." *Id.* at 10-11 (citing *Joseph v. Fluor Corp.*, 513 F. Supp.2d 664 (E.D. La. 2007) (finding that the Federal Emergency Management Agency did not exercise the requisite statutory degree of control over contractors who supplied trailers for Hurricane Katrina victims)).  Plaintiff contends that to find otherwise would render the statutory language meaningless. *Id.* at 11.  Addressing the detailed federal restrictions discussed in the *Notice of Removal*, plaintiff argues that such restrictions were applicable to all lead suppliers and that mere compliance with such restrictions by IS&R is an insufficient basis for removal under the statute.  *Id.* at 11-12.

In response, ARCO notes that courts have routinely concluded that government contractors were "acting under" federal officers within the meaning of the statute. *Memo. in Opp.*, pp. 7-8 (citing *Isaacson*, 517 F.3d 16-37 (manufacturer of herbicide Agent Orange); *Winters*, 149 F.3d at 398-400 (same); *Ferguson*, 475 F. Supp.2d at 729 (manufacturer of evaporators used on Navy ships during World War II)).  According to ARCO, "IS&R clearly was 'acting under' federal officers to the extent it was allegedly selling lead pigment to [Ohio paint manufacturers] identified in paragraph 39 of the Amended Complaint who were in turn making paint for the United States government." *Id.* at 8.  ARCO argues that IS&R helped the federal government by producing a needed item in the form of white lead carbonate. *Id.*

The *Notice of Removal* does not allege that IS&R was a party to a

9

contract with the federal government; ARCO asserts instead that its right to remove the action under the statute arises from the fact that the Ohio paint companies to which IS&R allegedly sold lead pigment in turn sold most of their output for government uses.[2]  *Id*. at 8-9 (citing *Amended Complaint*, ¶ 39).  ARCO offers two bases for its contention that IS&R was "acting under" federal officials even though it had no direct contractual relationship with the War Department. First, the government contractor defense protects subcontractors if the government approved "reasonably precise specifications" for the subcontractor's product.  *Id*. at 9 (citing *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 571-72, 574-76 (5th Cir. 1996); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 68-69, 71-72 (3d Cir. 1990); *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 947, 950-51 (4th Cir. 1989)).[3]  Second, government agencies controlled lead pigments in paint through federal paint specifications.  *Id*. at 10-11. Specifically, ARCO notes that Federal Specification TT-P-156 sets forth detailed requirements for white lead pigment.  *Id*. at 10

---

[2]In support of the argument that paint manufacturers sold most of their output to sustain the mobilization effort during World War II, ARCO relies on the *Affidavit of K. Austin Kerr, Ph.D.* ("*Kerr Affidavit*" or "*Kerr Aff.*"), which attaches multiple exhibits to the *Kerr Affidavit*, comprising over 800 pages.  *See Kerr Aff.*, attached as an exhibit to the *Memo. in Opp.*  Dr. Kerr is a Professor Emeritus of History at The Ohio State University.  *Id*. at ¶ 1. Dr. Kerr avers that the federal government considered lead an essential war material during World War II and that the government placed certain restrictions on the civilian use of lead, used the majority of painting supplies for federal jobs, including housing for civilian and military families, and produced specific formulations for painting supplies.  *Kerr Aff.*, ¶¶ 14-33.

[3]ARCO acknowledges that these cases did not discuss the removal statute, but argues that "there is no doubt that the subcontractor would have been permitted to remove the case under Section 1442(a)(1) to litigate its federal contractor defense."  *Memo. in Opp.*, p. 9 (citing *Isaacson*, 517 F.3d at 138-39).

(quoting Exhibit 23, attached to *Kerr Aff.*). ARCO concludes that IS&R was "acting under" federal officials because "the government directed and controlled IS&R's white lead business and had the authority to take the business over and run it as a government operation if IS&R did not comply with federal directives." *Id.* at 11.

In reply, plaintiff maintains that ARCO has not shown that IS&R was "acting under" federal officials when it supplied lead to Ohio paint companies in the 1930's and 1940's. *Reply,* pp. 4-10. Plaintiff characterizes most of ARCO's historical data as irrelevant to the issue in this case, which is whether IS&R had a "special relationship" with a federal agency by manufacturing "a product uniquely required by a government contract or function." *Id.* at 5-6 (citing *Isaacson*, 517 F.3d at 129; *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51 (D. Ma. 2008)). Plaintiff contends that "IS&R was merely the supplier of an *ingredient* in the recipe for paint or other applications in which lead pigment may have been used" and that it "did not manufacture a product for the government that was *uniquely* required by a government contract or function." *Id.* at 6 (emphasis in original). According to plaintiff, the specific requirements for white lead carbonate, to which ARCO referred in its *Memo. in Opp.*, was simply the formula for white lead carbonate as it was routinely prepared. *Id.* at 6-7 (quoting Exhibit 23, attached to *Kerr Aff.*, and *Painting Materials, A Short Encyclopedia*, Rutherford J. Gettens and George L. Stout, D. Van Nostrand Company, Inc., New York, 1942, attached as Exhibit 1 to *Reply*). Plaintiff argues that, in producing the lead pigment sold to the Ohio paint manufacturers named in the *Amended Complaint,* IS&R simply complied with a federal regulation,

11

which is insufficient to justify removal. *Id*. at 7 (citing *Freiberg v. Swinerton & Walberg Property Servs., Inc.*, 245 F. Supp.2d 1144, 1152 (D. Co. 2002)). Plaintiff further disputes ARCO's characterization that IS&R was a government subcontractor and characterizes IS&R as simply a supplier of a generic ingredient. *Id*. at 8. To conclude otherwise, plaintiff argues, "would mean that every supplier of a generic ingredient that ultimately ended up in a product provided to the government would be acting under color of federal office." *Id*.

### 3. Application

ARCO argues that the mobilization effort of the United States government during World War II "was unprecedented in American history and has never been repeated." *Memo. in Opp.*, p. 4. *See also Kerr Aff*. ¶¶ 4, 6. During this period, "powerful executive agencies" controlled the production and prices of commodities such as passenger automobiles, tires, gasoline, sugar, coffee, meats, butter, and "many processed foods." *Memo. in Opp.*, pp. 4-5 (citing *Kerr Aff*. ¶¶ 10-11). ARCO represents that the government considered lead an essential war materiel and asserts that "the government controlled and directed the pricing, mining, processing, distribution and uses of lead and lead products, including white lead carbonate pigment." *Id*. at 5, 11 (citing *Notice of Removal*, ¶ 15; *Kerr Aff*. ¶¶ 4-21). ARCO therefore emphasizes purportedly unique *circumstances* during a discrete period of this country's history that greatly impacted the production and sale of lead.

However, the cases upon which ARCO relies permitted removal where the defendant produced a unique *product* pursuant to a direct

12

relationship or contract with the government. *See Memo. in Opp*. pp.
7-8. For example, in *Winters*, the defendants were required, pursuant
to contracts with the government, to produce a unique herbicidal
mixture known as Agent Orange, unavailable in the commercial
marketplace, for government use in the Vietnam War:

> Each [defendant] was required to produce and provide to the
> Department of Defense the herbicidal mixture known as "Agent
> Orange"--with the specifications for the defoliant (and its
> packaging) *specifically dictated by the government*.
> Although the defendants had produced 2,4-D and 2,4,5-T for
> commercial use before government involvement, *their
> commercial formulations were never composed of a mixture of
> 100% pure 2,4-D/ 2,4,5-T, which the government required for
> the most part (98% for 2,4-D and 99% for 2,4,5-T) in its
> contracts with the defendants*. Instead, the defendants had
> always included a substantial percentage of inert
> ingredients to dilute the two active ingredients and
> required further dilution before commercial application. *In
> contrast, the government's specifications for Agent Orange
> included use of the two active chemicals in unprecedented
> quantities* for the specific purpose of stripping certain
> areas of Vietnam of their vegetation.

*Winters*, 149 F.3d at 399 (emphasis added).[4] Accordingly, the United
States Court of Appeals for the Fifth Circuit determined that the
defendants "acted under" federal direction. *Id*. at 400.

Similarly, in *Isaacson*, the defendants contracted with the

---

[4]Plaintiff and ARCO both observe that another case which involved Agent
Orange but which preceded *Winters* is "no longer persuasive." *Reply*, p. 12
(citing *Ryan v. Dow Chemical Co*., 781 F. Supp. 934 (E.D. N.Y. 1992));
*Surreply*, p.3 n.2 (same). In *Ryan*, the district court, remanding the case,
characterized Agent Orange as "a mix of *pre-existing chemical formulae that
had long been put to domestic commercial use* to reduce unwanted vegetation
along roads and railroad tracks and on farms. The government bought the
chemical components for Agent Orange and other defoliants *as existing products*
privately developed[.]" *Ryan*, 781 F. Supp. at 950 (emphasis added). However,
*Ryan* noted that the case "presents a close question." *Id*. Subsequently,
*Winters* implicitly rejected any contention that the government did not
exercise the necessary control over Agent Orange because it was an "off-the-
shelf" product. *Winters*, 149 F.3d at 398-400. *See also Isaacson*, 517 F.3d at
135 (noting that "*Ryan*'s holding has been called into question by" *Winters*).
All these cases, however, involved manufacturers who were parties to contracts
with the federal government.

federal government to produce Agent Orange. *Isaacson*, 517 F.3d at 137. The United States Court of Appeals for the Second Circuit concluded that defendants satisfied the "acting under" prong, noting later that defendants produced Agent Orange for the government in a concentration that was higher than that found in commercially available products. *Id.* at 137-38. Finally, the defendant in *Ferguson* "produced detailed plans" to establish that its predecessor "acted under" the direction of the United States Navy when it manufactured and supplied evaporators for use on naval vessels pursuant to Navy purchase orders during World War II. *Ferguson*, 475 F. Supp. 2d at 729-30 (stating that all naval "shipboard equipment had to be compatible and consistent"). All of these cases demonstrate that the defendant contractors in these cases were assisting the federal government, and therefore "acting under" it, by producing a *unique product* specifically for the federal government.

To the extent that ARCO argues that the federal government "exercised control over the pigment contained in the paint through the terms of federal paint specifications[,]" this contention fails to demonstrate that the *pigment*, an ingredient in lead paint, was made uniquely for the federal government. *Memo. in Opp.*, pp. 10-11. Indeed, plaintiff, citing to an authority on painting, argues that the federal specification for pigment was simply "the chemical formula for white lead carbonate *as it is routinely prepared*" and was therefore a generic lead pigment. *Reply*, p. 7 (citing *Painting Materials, A Short Encyclopedia*, Rutherford J. Gettens and George L. Stout, D. Van Nostrand Company, Inc., New York, 1942, attached as Exhibit 1 to *Reply*). ARCO, in contrast, does not even allege that the pigment was

14

unique.  *Memo. in Opp.*, pp. 10-11.[5]  In short, there is no evidence
that the pigment produced by IS&R was a unique product for the federal
government that was otherwise unavailable on the commercial market.

　　Absent evidence of a unique product, all that is left is that
IS&R purportedly complied with detailed federal regulations and that
the federal government entered the commercial market for pigment with
some specifications in mind.  However, compliance with federal
regulation alone is insufficient to establish that IS&R was "acting
under" a federal officer.  *See Watson*, 127 S.Ct. at 2307-08.  *See also
Joseph v. Fluor Corp.*, 513 F. Supp.2d at 673 (the Federal Emergency
Management Agency "merely entered the market for travel trailers as
would any other buyer, with certain practical and economic
considerations in mind") (citing *Winters*, 149 F.3d at 398-400).
Therefore, ARCO's reliance on *Winters*, *Isaacson* and *Ferguson*, while
arguing that the unprecedented *circumstances* of World War II created
the necessary "special relationship," is misplaced.

　　The direct contractual relationship between the federal
government and the defendants in *Winters*, *Isaacson* and *Ferguson* also
distinguishes the instant action.  ARCO argues to the contrary,
contending that it may remove the case because subcontractors are
entitled to the protection of the government contractor defense.
*Memo. in Opp.*, p. 9.  ARCO's argument is unpersuasive.  First, ARCO
fails to present any evidence, and even fails to affirmatively assert,

---

[5]At oral argument, counsel for ARCO could not state whether federal
pigment specifications during the relevant time period were unique.  Counsel
instead focused on the period "in which the government fully organized and
controlled the economy, in addition to being the largest user of paint. ... "
*Transcript of Oral Argument,* at 14.

that it qualifies as a subcontractor. *Id.* A subcontractor is "one
who performs for and takes from the prime contractor a specific part
of the labor or materials required by the original contract."
*Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 109 (1944).
Paragraph 39 of the *Amended Complaint* does not allege that either ARCO
or IS&R acted as a subcontractor for paint manufacturers in Ohio. In
any event, ARCO cites to no authority for the proposition that a
subcontractor entitled to the protection of the government contractor
defense may, on that basis alone, remove the action under 28 U.S.C. §
1442(a)(1).[6] ARCO seems to suggest that, because it invokes the
government contractor defense in the action, it follows that removal
under 28 U.S.C. § 1442(a)(1) is proper. There is no authority for
such an argument. Regardless of whether or not ARCO raises a
colorable federal defense, ARCO must, in order to properly invoke §
1442(a)(1), separately demonstrate that it assisted or helped carry
out the duties or tasks of the federal superior. *See Watson*, 127
S.Ct. at 2307.

For all these reasons, the Court concludes that ARCO has failed
to establish that it enjoyed a "special relationship" with a federal
official or agency; ARCO therefore has not met the "acting under"
requirement of the statute. ARCO's contention that it is entitled to
the protection of the statute because it produced a generic ingredient
during the federal government's unprecedented control of the United
States economy during the period surrounding World War II proves too

---

[6]The subcontractor defendants in the cases cited by ARCO, *Memo. in Opp.*,
p. 9, invoked diversity jurisdiction on removal, not the federal officer
removal statute.

much.  To accept this argument would mean that every manufacturer of a generic ingredient in an "off-the-shelf" product that the federal government regulated and may have purchased during World War II would be "acting under" the federal government.[7]  The list of such entities would be virtually limitless, thus eroding the purpose and standards of 28 U.S.C. § 1442(a)(1).

### C. "Causal Connection" or "Nexus"

Having concluded that ARCO was not "acting under" a federal officer or agency, the Court will not discuss at length the related requirement that "a causal nexus exist[] between [IS&R's] actions under color of federal office and the plaintiff's claims." *Winters*, 149 F.3d at 398 (citing *Willingham v. Morgan*, 395 U.S. 402, 405-06 (1969)).  In undertaking this analysis, the Court credits ARCO's theory of the case.  *See Isaacson*, 517 F.3d at 137 (citing *Jefferson County*, 527 U.S. at 432).

ARCO nevertheless fails to establish a causal connection between the actions of IS&R and plaintiff's claims.  ARCO contends that IR&S acted under the control of federal agencies of wages for white lead plant employees and that federal agencies "directed the pricing, mining, processing, distribution and uses of lead and lead products, including white lead carbonate pigment." *Memo. in Opp.*, p. 5. However, these sorts of control have nothing to do with the nuisance alleged in the *Amended Complaint*.  Instead, the key is control over

---

[7]The Court notes that ARCO previously argued in another context that the federal government controlled other raw materials and finished products during World War II, further highlighting that the federal government generally regulated the economy and many materials during this time.  *See, e.g., United States v. Atlantic Richfield Company*, No. CV-89-039-BU-PGH, 1996 U.S. Dist. LEXIS 22884, at *12-13 (D. Mt. May 30, 1996).

the formula or specification of the pigment that purportedly created the nuisance.  In this regard, the Agent Orange line of cases is instructive.  There, the courts explicitly looked to the federal government's specifications that created a unique product, which formed the basis for the plaintiffs' claims.  *See Isaacson*, 517 F.3d at 137-38; *Winters*, 149 F.3d at 399-400.  As discussed *supra*, ARCO has failed to show that IS&R created a unique pigment pursuant to the federal government's specification.  Accordingly, ARCO cannot meet the causation requirement.

**D.    "Federal Defense"**

ARCO has the burden of raising a colorable federal defense.  *See Isaacson*, 517 F.3d at 138.  To be "colorable," ARCO need not prove that it will prevail on its federal defense.  *Id*. at 139; *Winters*, 149 F.3d at 400; *O'Connell v. Foster Wheeler Energy Corp.*, 544 F.Supp.2d at 54 ("For removal purposes, the defendant's showing need only be plausible; not necessarily conclusive of the issue.") (citing *Jefferson County*, 527 U.S. at 431)).  Instead, ARCO must demonstrate that its federal defense arises in connection with official duties.  *See Isaacson*, 517 F.3d at 138 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)).

ARCO asserts two federal defenses.  First, ARCO invokes the federal contractor defense.  *See Memo. in Opp.*, pp. 14-15; *Surreply*, pp. 3-4.[8]  Second, ARCO raises a federal constitutional defense,

---

[8]"[T]he government contractor defense protects a government contractor from liability under state tort law when the Government approved the product's general design, the product conformed to that design, and the contractor warned the Government of the risks of the product."  *Isaacson*, 517 F.3d at 138.

18

arguing that plaintiff's nuisance claim seeks to impose retroactive liability in violation of the Takings Clause and the Due Process Clause of the Fifth Amendment to the United States Constitution. Considering the very low showing required to satisfy this element of the removal statute and in light of the fact that the Court has concluded, *supra*, that ARCO failed to satisfy other elements of the statute, the Court will not consider plaintiff's attacks, made for the first time in the *Reply*, on the sufficiency of these defenses.

**IN SUM**, the Court concludes that the action was improperly removed under 28 U.S.C. § 1442(a)(1).

It is therefore **RECOMMENDED** that *Plaintiff State of Ohio's Motion to Remand to State Court*, Doc. No. 38, be **GRANTED** and that the action be **REMANDED** to the Court of Common Pleas for Franklin County.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days, file and serve on all parties written objections to the specific findings or recommendations to which objection is made, together with supporting authority for the objection(s).  The District Judge will make a *de novo* determination of those portions of the *Report and Recommendation* to which objection is made.  The District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the District Judge review the *Report and Recommendation* *de novo*,

and also operates as a waiver of the right to appeal the decision of the District Judge adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Finally, the parties are advised that the time for filing objections to this *Report and Recommendation* will not be extended.

August 28, 2008                                        *s/Norah McCann King*

                                                Norah M$^c$Cann King
                                     United States Magistrate Judge